UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JUAN OQUENDO and MYRIRYA OQUENDO,
Individually and As Husband and Wife,

                                                                                            05 Cv. 9398 (CLB)

                        Plaintiffs,

                                                                                        ***Memorandum & Order***

           - against -

CINCINNATI INCORPORATED,

                        Defendant.
-------------------------------------------------------------x
Brieant, J.

       Before the Court in this removed product liability and personal injury case controlled by New York Law, is a Motion filed by Defendant filed on February 27, 2007 (Doc. 48) for Summary Judgment and to Exclude an Expert Witness Report.

       The standards for granting summary judgment in this Circuit are so well known as to require no citation. Where, as here, on all the evidence presented, viewed most favorably to the non-moving party, no reasonable juror could find a duty of due care, its breach, or causation, summary judgment must be granted.

       The following facts are either undisputed or presumed true for purposes of this motion only. At relevant times, plaintiff Juan Oquendo was a production employee of the Altman Stage Lighting Company in Yonkers, NY, (Altman) and an ordinary user of a "Cincinnati 90AFX8" hydraulic press brake ("Press Brake") manufactured by Defendant Cincinnati, Inc. ("Cincinnati"). The machine is used for the purpose of bending metal, and has a ninety ton

capacity of pressure exerted between a bed/base and a "ram," which comes down producing the force needed to bend a metal product. Altman designs and manufactures industrial lighting equipment and uses the press brake in the course of its production. Altman purchased the Press brake new from Cincinnati in 1989.

William Bosak was an employee of Altman since 1989 and with Plaintiff was one of two individuals who was allowed at relevant times to work on the press brake. It was he who trained and supervised Mr. Oquendo's work with the press brake at Altman.

Defendant had no maintenance contract for the routine inspection or repair of the press brake, although such services were available for a fee. On occasion, repair work was done in house by Mr. Bosak assisted by Plaintiff. Cincinnati made regular "courtesy calls" at Altman's plant, usually, but not always including an inspection and/or service of the machine, and responded from time to time when requests for parts or service were issued by Altman.

*The Accident*

Under familiar principles, to the extent that the Affidavit submitted by Plaintiff in opposition to the pending motion differs from his sworn testimony at his deposition held September 27, 2006, the deposition testimony controls. On July 6, 2003, Mr. Oquendo who had been employed at Altman since 1989 was operating the press brake. He had used the press brake for more than two years. At the time of his injury, he was bending metal to form a frame for a cue light measuring 6" x 6" x 6" and with a depth of 3/4 of an inch. He was cutting strips about

3/4 of an inch wide and 2 feet long on another machine, taking them to the press brake and bending them.  This was the sort of work which Mr. Oquendo performed on a regular basis at Altman.  He went to work at 8:30 A.M., and was injured mid-morning, when he alleges that as he was positioning a partially formed piece by pressing the piece against the back guage, the guage moved back, causing him to lose his balance and to lean forward into the point of operation.  He alleges that without his operation of the footswitch, the press ram began to descend and that it trapped and crushed his left arm until he was able to reach a pushbutton control to stop and reverse the motion of the ram and free his arm.

Plaintiff testified that prior to the accident, the machine which was computer controlled would on occasion shut off by itself and while the screen remained on, the ram was inoperable. When the machine powered out, Oquendo's supervisors told him to turn it off, wait awhile and turn it back on and see what happens (Tr. at 58).  He stated that he "kept stepping on the foot pedal and the ram would not come down.  The pedal would stick and sometimes it would go down without touching it and sometimes would make the machine skip steps" (Tr. at 60).  He described the foot pedal as operated by his right foot and that "[i]t has a covering.  Your lift it up with your foot.  You put your foot into the pedal.  And you step on it.  And it causes the ram to come down."  He testified that on occasion prior to the accident "[y]ou would step on the pedal. It wouldn't go down.  The ram wouldn't go down." (Tr. at 61).

Mr. Bozak ordered parts from Cincinnati to remedy the condition, but he himself repaired the foot switch and installed the parts prior to the accident.  About a 1-1/2 months or 2 months

after Mr. Bozak repaired the foot switch, the machine began shutting off and shaking the gauges or dials.  The message on the computer screen would be "ram off." (Tr. at 70).  Again, it became the practice to shut the machine down, wait, and restart it.  The defect described by Mr. Oquendo seems to be that the ram would not move but when the machine shut off, it could be restarted after a lapse of time (Tr. at 70-71).  On the day of the accident, immediately prior to his coffee break, the machine had shut down, but was operable when he returned to work.  The machine operated for fifteen minutes prior to the accident.  Mr. Bozak adjusted the gauges which were shaking shortly prior to the accident.

After Plaintiff's injury, the press brake was shut down until July 13, 2004, at which time Mr. Gary Remlinger of Cincinnati, inspected it, and reported problems requiring servicing and repair, including the notation: "Found top foot switch contact intermittent.  Recommend replacement of the foot switch and cable.  Foot switch on indicator light socket broken." 7/13/2004 Repair Report; *Remlinger at 177.*  He also apparently found fifty "fault-error codes" listed on the computer of the press brake on that date, but determined that they were insignificant and didn't record them.  *Remlinger at 168, 177.*

Mr. Gary Remlinger has been a service representative with Cincinnati since 1974.  Around 1991 he became Altman's service representative and remained as such through July 2004.  He continues to work for Cincinnati.  Mr. Remlinger is apparently the only person who had an opportunity to inspect the press brake in the condition in which it existed immediately after the July 6, 2004 incident.  Thereafter on August 5, 2004, the foot pedal of the

machine was replaced. There is some dispute as to the chain of custody of the removed foot pedal and cable and whether the condition at the time it was presented for inspection in December 2006, with negative results, see *infra*, was the same as it was in July 2004.

In its motion papers, Defendant argues that Plaintiffs have failed to: (1) offer any reliable expert evidence of how the "intermittent contact" caused the ram to descend without the foot switch being depressed, in contrast to Defendant's expert evidence, or how the condition could cause an alleged delay of indeterminate duration; (2) raise a triable issue of fact regarding their claims of any duty to inspect or repair on the part of Defendant; (3) show causation because Altman, through Bozak, often performed maintenance service and repair without Defendant's involvement, and did so with respect to the foot switch shortly prior to the accident.

Defendants argue that Plaintiffs have failed to show evidence of any participation associated with the repair attributable to Defendant, rather than to Mr. Bosak, and "have not ruled out other potential causes of Mr. Oquendo's accident, including user error" and have relied instead "on unsupported speculation."

Prior to the accident, Mr. Bozak obtained a belt which he installed as a non-factory add-on to the machinery, in order to prevent the gauges from undue movement. This may be regarded as a material modification of the machine as manufactured. The gauges continued to shake after the addition of the belt and a grinding sound was heard by the operator, but after the Bozak modification, the gauges "didn't shake as much." (Tr. at 109). Nobody from Cincinnati

was called in to see or repair the machine between the installation of the belt by Mr. Bozak and the accident.

Mr. Oquendo testified that when the accident happened, the machine was positioned for Step 2 in the manufacturing process. Step 1 was a ninety degree bend down the full length of a narrow piece of metal and, following the first bend, in order to take the second step, the work piece is positioned perpendicular to the die (Tr. at 112). That is the position it was in at the time of the accident. For reasons not clear to the Court, in his recent Affidavit in Opposition to the Motion for Summary Judgment sworn to by Mr. Oquendo on March 13, 2007, long after his deposition, Plaintiff contends that he was in the process of performing the *first* of the four steps required in the manufacturing process rather than the second step.

As noted earlier, the deposition testimony of the Plaintiff must control for purposes of the motion. He claimed in his deposition that the machine skipped Step 2 and the machine jumped to 3 as indicated on the computer screen. He then claimed that "[t]he ram came down and grabbed my arm and squeezed it." He conceded that in order for the ram to come down "you have to step on the pedal or foot switch" and claimed he was not doing so at the time. He testified that he did not reach into the machine (Tr. at 120). He claimed the top die came in contact with his arm and that, as he was pulling back after the ram grabbed his arm, he pressed the "up ram" yellow button. He denied that he stuck his hand in the machine to retrieve a dropped piece (Tr. at 237).

*Design Defect*

There is no evidence in the record and apparently it is not even claimed by Plaintiff that a design defect existed in the product when it left the hands of the manufacturer. The product functioned for many years under the sole control of Altman without any problem. This particular device was manufactured in accordance with the intended design and the warnings were adequate. Insofar as concerns Plaintiff's claim that the machine should have been sold to a knowledgeable user, with a so-called "presence sensing device" referred to also as a "light curtain," as an additional optional operational safeguard, this claim is barred by New York Law. See *Scarangella v. Thomas Built Buses, Inc.,* 93 N.Y. 2d 655, 662 (1999).

Plaintiff seems to claim an "intermittent contact" condition of the foot switch allegedly caused the ram to descend after a brief delay without the foot switch being depressed. As noted below, that the ram would not come down when the foot switch was depressed by the operator because of intermittent contact, does not support an inference that it could or would come down without anybody pressing the foot switch. There is no evidence to support a conclusion that the foot switch was defective either in manufacture or in its design when the press brake left the factory in 1989. It is undisputed that after difficulties of operation were experienced in 2004, Mr. Bozak of Altman ordered parts only from Cincinnati, and installed the parts himself with the aid of Mr. Oquendo. No inference of negligence against Cincinnati results from simply selling the parts, and to the extent that any tinkering with the foot switch by Bozak might have caused the accident, his negligence is not imputed to Defendant.

*Duty and Breach*

It is clear as a matter of New York Law that Cincinnati as an independent repair contractor owes no duty to Plaintiff under the circumstances of this case.  Altman never had a maintenance contract, express or implied, of any kind with Cincinnati subsequent to the purchase of the machine.  Defendant had offered Altman a Planned Maintenance Program, which Altman refused to take, and there was no contractual obligation of the Defendant to routinely inspect or maintain the equipment.  *See e.g.,Vermette v. Kenworth Truck Co., Div. of Paccar, Inc.*, 68 N.Y.2d 714 (N.Y. 1986)(court noting that Plaintiff failed to controvert Defendant's proof that there existed no agreement to provide routine or systematic maintenance on a vehicle); *see also McMurray v. P.S. Elevator*, 224 A.D.2d 668 (2d Dept. 1996)(where there was no service contract and Defendant was not charged with the duty of continued maintenance of a freight elevator, and where Defendant did not have exclusive control over its maintenance, it was error to let a jury circumstantially infer negligent maintenance under the doctrine of *res ipsa loquitur*); *see also Potaczala v. Fitzsimmons*, 171 A.D.2d 1015 (N.Y. App. Div. 1991)(Otis satisfied its burden to show that it never agreed to undertake nor did undertake responsibility to maintain, service or repair the gates and locking devices of the subject elevator).  Here, Cincinnati had no duty to inspect the machinery for defects unrelated to problems it was summoned to correct, or to warn the Plaintiff's employer of any such defects.

The record is clear that much maintenance inspection and repair was done directly by Altman through Mr. Bozak.  When he chose to do so, it is undisputed that Mr. Bozak would call Cincinnati regarding a specific issue, and only then Cincinnati would send a service

representative.  Repairs, if any, were authorized on an *ad hoc* basis as approved by Altman.  Cincinnati had no authority to perform repairs or maintenance unless ordered to do so by Altman.  Defendant was not the sole and exclusive provider of maintenance and repairs for the press brake.  Its status was that of an independent repair contractor with no duty to detect any dangerous condition in advance or to fix it.

Whether a duty is owed in the context of negligence, is an issue of law.  Here there was no duty and under New York Law, even if a contractual obligation to repair existed, it would not give rise to tort liability in favor of a third party such as Mr. Oquendo.  *See Espinal v. Melville Snow Contractors, Inc.,* 98 N.Y.2d 136 (2002); *see also Eaves Brooks Costume Co. v. Y.B.H. Realty Corp.*, 76 N.Y.2d 220 (N.Y. 1990).

Neither was there a breach of duty.  No reasonable juror in the context of this case could find liability on the part of the Defendant for breach of any duty to maintain or inspect or repair the press brake.  The only defect or problem claimed by the Plaintiff is the claimed intermittent contact in the foot switch.  The only repair performed to the foot switch was by Mr. Bozak of Altman in July of 2003.  Because there was no contractual duty on the part of Cincinnati to inspect or repair the foot switch, there is no breach of any duty, and no negligence.

*Causation*

It is also an essential part of Plaintiff's case to prove by the preponderance of the credible evidence that the defect alleged, namely the intermittent contact in the foot switch

caused the ram to come down on Mr. Oquendo's arm.  For this, Plaintiff relies entirely on the expert testimony of Joseph Cristino, a licensed professional engineer, discussed below, who conceded that he never reviewed the wiring schematics for the press brake in this case.

Joseph Cristino, a licensed professional engineer since 1984, engaged in electrical engineering consulting, was retained by Plaintiffs' counsel on September 5, 2006.  He prepared his seven page report on January 3, 2007 and was deposed on January 16, 2007.

Mr. Cristino had no prior experience with a press brake.  On the inspection, Mr. Cristino found no physical evidence to support any malfunction of the foot switch, and no evidence of an intermittent contact problem (Tr. at 52, 58).  Cristino discounted the testimony of Remlinger and Bosak that the ram will not move down in the absence of proper (i.e. closed) operation of the electrical contacts in the foot switch, and that the ram will not move down unless the operator presses his or her foot into the switch (Tr. at p. 67 *et seq*).  He conceded he never studied the internal control circuitry of the foot switch (Tr. at 70).

The apparent defect relied on by Mr. Cristino was that prior to the accident, on occasion the ram would not come down when the foot switch was depressed.  This does not imply or support a conclusion that the ram did or could come down without anybody pressing the foot switch.

Mr. Cristino testified (Tr. at 78 *et seq.*):

Q. Can you explain within a reasonable degree of engineering certainty, and a technically feasible manner, how with no one stepping on the foot switch, the ram was caused to move down?

A. I feel that that was a direct response to that intermittent contact that was found in the foot switch.

Q. Well, you say you feel that. But I would like you to explain to us, how within a reasonable degree of engineering certainty, you are able to express that opinion without first having analyzed the internal control circuitry of the control panel itself, rather than just the foot switch, the press brake itself, rather than just the foot switch?

\*   \*   \*   \*

A - - the fact that the machine had malfunctioned similarly in the past, that it can't be ruled out, and therefore, not having an intimate knowledge of the control circuitry, but knowing the machine had previously malfunctioned, therefore it can be stated with a reasonable degree of engineering certainty, that the machine, the ram was capable of coming down, based on those conditions that were in the field at that time.

Q. Well, do you have any information that anyone other than Juan Oquendo has ever reported that the ram came down without someone stepping on the foot switch on that press brake?

A. No, sir.

Q. And in fact, you are aware of information that others have testified that the ram will not come down unless someone steps on the foot switch and the foot switch contacts are operating properly?

A. That's correct.

Q. Now, you yourself have never duplicated the situation described by Mr. Oquendo that the ram came down by itself so to speak without his stepping on the foot switch? Have you attempted to duplicate that?

A. No, sir.

11

Mr. Cristino's opinion does not fit the facts of the case and defies logic. No reasonable juror could rely thereon for the proposition that the ram could come down with no foot on the foot switch. The defect of intermittent contact means only that the ram would not always come down when the operator's foot closed the switch.

In his deposition, Defendant's expert witness explained:

> Oquendo and Bosak in their depositions repeatedly state that the foot switch was intermittent. But the intermittency is exhibited as a failure of the ram to come down. They don't really know if the switch is intermittent at this point. They know that if I push down on the pedal the ram operates, then I bend the part, I push it over, I push the foot switch down, I bend the part. The next time, it doesn't happen. That what they mean by intermittent.
>
> But they never say that there was a time when they didn't push the switch down, but the ram came down. So it's always a failure to initiate the next step, and it's never the initiation of an operation without a command to operate.

*Finnegan* at 265. He continued:

> [A]n intermittent operation would not have caused him to be injured, especially since they never say that that intermittency included an unintentional operation of the ram. The ram came down. I believe that was because the switch operated properly. There is no evidence that the ram ever came down except upon operation of the switch. So, I told you the story doesn't fit together.
>
> Oquendo says he didn't operate the foot switch. He didn't even have his foot in there. He had it on top of the switch, which is a funny thing to say. But there is no evidence that there was a malfunction of the switch that was causative to his injury. He crushed his arm, but he had to have stepped on the switch, and the switch most likely operated properly, and the ram came down. There's all kinds of built-in electronics to say the ram isn't going to move until we get the right signals here, and it involves more than one signal that has to come.

*Finnegan* at 267-68.

By affidavit, he further explained (Doc. 55 at ¶ 12):

> [B]ecause of the "intermittent" condition, which [Mr. Remlinger] observed on July 13, 2004, the foot switch would not "reset" sometimes when it was fully released, thus

preventing the operator from initiating a new cycle.  Remlinger deposition, p. 178. In other words, the condition detected by Mr. Remlinger was such that *intermittently,* the CNC circuitry in the press brake would not detect when the foot switch was returned to the fully "up" position.  The only effect this condition would have on the operation of the press brake is that downward motion of the ram could not be initiated, i.e., it could not cause the ram to come down.  Remlinger deposition, p. 178.  This is explained further in paragraph 17 below in the discussion of design redundancies, multiple switch contacts and how the proper sequential operation of the several switch contacts is required to move the ram downward.  Mr. Cristino misconstrues the observation by Mr. Remlinger in his July 13 service report concerning an "intermittent" condition in the foot switch.  The condition identified by Mr. Remlinger *could not have caused the ram to come down,* and it certainly did not cause Mr. Oquendo's arm to be in the point of operation.  (Emphasis added)

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgement (Doc. 48) is granted.  So much of the motion which seeks a *Daubert* ruling need not be decided.

The Clerk shall file a final judgment.

X

 X

 X

13

SO ORDERED.

Dated: White Plains, New York
       July 9, 2007

                                    _____
                                    Charles L. Brieant, U.S.D.J.

*14*